## ILLINOIS CENTRAL RAILROAD COMPANY

### *v.*

## ROBERT A. McCLELLAN.

1. CARRIERS—*delay in transporting grain—perishable property.* In an action against a railroad company to recover for injury to a quantity of corn, occasioned by delay in the transportation of the same, the defendants can not claim exemption from liability under a clause in the bill of lading which releases them from loss on perishable property. Mature, merchantable corn can not be regarded of that character.

2. SAME—*duty in regard to delivery of goods.* Only the acts of God or the public enemy will excuse common carriers for non-delivery of goods entrusted to them for transportation.

3. SAME—*duty as to preservation of goods.* But while carriers are insurers for the delivery of goods bailed, they are not insurers that they shall reach their destination in the same condition in which they were

shipped. They are not liable for losses from ordinary wear and tear of goods in the course of transportation, or from their ordinary loss, deterioration in quantity or quality in the course of the voyage, or from inherent natural infirmity and tendency to damage, or which arise from the personal neglect or wrong, or misconduct of the owner or shipper of the goods.

4. But a common carrier is bound to use due diligence for the preservation of the goods from damage and deterioration. If the care which prudent men ordinarily take of their own property be omitted and loss ensue, the carrier will be liable.

5. And the carrier will be liable for any damage to property resulting from unreasonable delay in transportation, unless excused by uncontrolable circumstances.

6. Same—*what constitutes unreasonable delay.* Where corn was received by a railroad company to be transported to a point, the usual time for reaching which was two and one-half to three days, and there was such delay on the part of the company that the shipment did not reach its destination, a part of it until eleven days and a part forty-five days after it was shipped: *Held*, this was such delay as would render the company liable for any damage resulting to the corn by reason thereof, there being no sufficient excuse to justify it.

7. Same—*military control of a railroad, as an excuse for delay.* The mere fact that a railroad was under the control of the military authorities, in a time of war, at the time the company received freight for transportation, will not excuse the carrier from his obligation to deliver the goods within a reasonable time, it appearing that the military authorities, so far from preventing them being transported, gave express permission for that purpose. And especially would this be the case where the carrier had failed to limit his liability, in respect to such contingencies.

8. Same—*of obstructions at the place of delivery.* Nor would the fact that the accumulation of cars and freight at the place of delivery, was such that the company could not reach that point within a reasonable time, exonerate the carrier, it being within the power of the company to have removed the obstruction. The interest or mere convenience of the carrier should not be allowed to stand in the way of his duty, in that respect. And moreover, the carrier should provide in his contract for such a contingency, if he would limit his liability.

9. Measure of damages—*in suit against a carrier for not delivering goods in proper time.* In an action against a carrier, to recover for damage to grain, resulting from unreasonable delay in its transportation, if the grain was to be delivered under a contract of sale by the shipper, the contract price should be taken as the basis for estimating the damages; otherwise, the market price at the place of delivery, at the time the grain should have reached there, should govern.

Appeal from the Circuit Court of McLean county; the Hon. John M. Scott, Judge, presiding.

This was an action on the case, brought by Robert A. McClellan, against the Illinois Central Railroad Company, as a common carrier, to recover for damage to a quantity of corn shipped by the plaintiff upon the defendants' road from various points in this State, and to be transported to the city of Cairo, the damage resulting from the alleged neglect of the defendants to deliver the corn within a reasonable time.

The shipments were made under bills of lading, of which the following is a copy:

Hudson Station, April and May, 1865.

Received from R. A. McClellan, in apparent good order, by the Illinois Central Railroad Company, consigned to ———, the following articles, as marked and described in the margin, subject to the conditions and regulations as per published tariff of said company, and payment of freight at the rate of ——— per 100 lbs.; and such other expenses or charges as may have accrued upon said articles. It is expressly agreed and understood that the company are not responsible for loss of goods of which the contents are unknown; for leakage of any kinds of liquids, breakage of any kinds of glass, carboys of acids, or articles packed in glass; stoves or stove furniture, castings, machinery, carriages, furniture, musical instruments of any kind, packages of eggs, or for loss or damage on hay, hemp, cotton, or any articles the bulk of which renders it necessary to be shipped in open cars, or for damage on perishable property of any kind, occasioned by delays from any cause, or change of weather, or for damage or loss by fire, or for loss or damage on the lakes or rivers, unless it can be shown that such damage or loss occurred through the negligence or default of the agents of the company. And it is further especially understood, that for all loss and damage occurring in the transit of said packages, the legal remedy

shall be against the particular carrier or forwarder only, in whose custody the said packages may actually be at the time of the happening thereof, it being understood that the said Illinois Central Railroad Company assumes no other responsibility for their safety or safe carriage than may be incurred on its own road. All packages subject to charge for cooperage, if necessary.

The usual time for transporting freight from the places of shipment to the place of destination, was shown to be from two and one-half to three days, when it appears these shipments were not delivered at Cairo in a shorter time than eleven days, and some of them were delayed on the route as long as forty-five days.

After the grain arrived at Cairo, the place of destination, it was found to be damaged from being overheated, and was sold at a very low price.

The defendants set up as an excuse for the delay in delivering the corn, that prior to the time of its shipment, the government of the United States, through its military officers, had assumed the control of their road for its own purposes, in the transportation of troops, army supplies and munitions of war, excluding the company from the management of its affairs to such an extent that the delay in delivering this grain was unavoidable.

The company further allege, that by reason of the large number of cars and quantity of freight accumulated on the tracks of the road at Cairo, through the action of the military authorities, it was impossible to deliver this grain at an earlier period.

A detail of the facts connected with this defense will be found in the opinion of the court.

A trial in the court below resulted in a verdict and judgment in favor of the plaintiff. The defendants thereupon took this appeal.

Messrs. WILLIAMS & BURR, Mr. GEORGE TRUMBULL and Mr. CHARLES EMERSON, for the appellants.

Common carriers are not liable for delay, when they have exercised due diligence, and have been interrupted by causes beyond their control. Pierce on Railways, p. 411; 19 Barb. 36; 2 Kernan, 245; *Clark* v. *Barnwell,* 12 Howard, 279; 14 Wend. 215; 12 Barb. 321; 18 Ill. 489; Edwards on Bailments, 520, 523, 524, 526.

Where the law creates a duty or charge, and the party is disabled to perform it, without any default in him, and hath no remedy over, then the law will excuse him; but when the party by his own contract creates a duty or charge upon himself, he is bound to make it good, if he may, notwithstanding any accident· by inevitable necessity, because he might have provided against it by his contract. 7 Term Rep. 267. In the case of *Hadley* v. *Clarke,* 7 Term, 259, the contract was to carry the goods, the dangers of the sea only excepted.

The bill of lading given by the Illinois Central Railroad Company, contained this provision: That the company are not responsible for damages on perishable property of any kind, occasioned by delays from any cause.

The action, however, is brought against the company, not on special contract, but as common carriers, and attempts to hold the company liable, by reason of the legal duty cast upon them as common carriers; this being only a legal duty, it is, in the case above quoted, a sufficient defense to show that the company was not able to perform the duty.

Unless the carrier contracts to deliver the goods in a particular time, he is not liable for a delay not caused in any way by his fault. *Conyer* v. *Hudson River Railroad Co.* 6 Duer, 375.

If the bill of lading in this case is a special contract between the parties, and was so declared upon, we should then hold that by its terms the appellants were not liable for any damages for detention of the freight by delay in shipment, but it will be time enough to discuss this branch of the case when a suit is brought upon the bill of lading as a special contract. *York Co.* v. *Illinois Central Railroad Co.* 3 Wall. U. S. Rep. 107.

Messrs. Lincoln, Smith & Warnock, with whom was Mr. W. H. Hanna, for the appellee.

The company knew of the contingencies in the way of a prompt delivery of the grain at the time they received it, and the receipt of it was a virtual agreement that they could and would carry and deliver it within such time as was usual and was safe to the grain. *Place* v. *Union Express Co.* 2 Hilton, 27. The case of *Wibert* v. *New York & Erie Railroad Co.* 19 Barb. 36, does not apply, for the reason that in that case the damage was not caused by the delay, whereas in this case, and in *Place* v. *Union Express Co.* the damage was caused by the unreasonable delay.

The bill of lading in this case is a special contract, containing limitations upon the common law liability of the carrier, which, it is pretty well settled, is allowable. *Door* v. *The N. J. W. Nav. Co.* 1 Kern. 492; *N. J. W. Nav. Co.* v. *Mer. Bank,* 6 How. 384; *Brehme* v. *Adams Express Co.* 25 Md. R. 335; *Illinois Central Railroad Co.* v. *Morrison,* 19 Ill. 140; *Illinois Central Railroad Co.* v. *Smyser,* 38 Ill. 361. But this can only be within certain limits. He can not contract to excuse himself from negligence. *Graham* v. *Davis,* 4 Ohio St. R. 374; *Davidson* v. *Graham,* 2 Ohio St. R. 131; *Welsh* v. *Railroad Co.* 10 Ohio St. R. 75; *Illinois Central Railroad Co.* v. *Morrison,* 19 Ill. 140; *Illinois Central Railroad Co.* v. *Smyser,* 38 Ill. 361; The contract under which these shipments were made, so far as it was a mere receipt for the goods, could be explained by parol. 1 Greenlf. Ev. sec. 305; *Higgin* v. *The U. S. Mail Ship Co.* 3 Blackf. C. C. R. 283.

But so far as it contained the terms of the contract, it could not be explained or construed by parol evidence. 1 Greenlf. Ev. 305; *Wolf* v. *Myers,* 3 Sandf. 305; *Myers* v. *Peck,* 28 N. Y. 590.

So it was not competent to show the plaintiff knew of or consented to the delay at the time of shipment.

Inasmuch as this contract contained specific exceptions, no other or further condition can be supplied by law, or by parol

evidence. Broom's Legal Maxims, 414, 415; *Aspdin* v. *Austin,* 5 Ad. & El. N. S. 684; *Hare* v. *Horton,* 5 B. & Ad. 939; *Cooper* v. *Walker,* 4 B. & C. 49.

The law construes this contract to be one to carry within a reasonable time. Angell on Car. sec. 283; *Hand* v. *Baynes,* 4 Whart. 213; *Raphael* v. *Pickford,* 6 Scott N. R. 484; *Bennett* v. *Byram,* 38 Miss. 21.

This construction being that fixed by the law, upon an unequivocal written instrument, it cannot be controlled or changed by parol. *Insurance Co.* v. *Wright,* 4 Wallace, 479; *Oelricks* v. *Ford,* 23 How. U. S. 534; *Webster* v. *Paul,* 10 Ohio St. R. 534.

It was not competent, therefore, to show that the plaintiff knew the road was blocked up and that the goods would not or could not be forwarded within a reasonable time. *Western Tr. Co.* v. *Newhall,* 24 Ill. 468; *Michigan Central Railroad Co.* v. *Hale,* 6 Mich. 256.

The company received this corn knowing its nature and liability to spoil in that season of the year by delay, and they knew their own condition, and they can not excuse themselves simply by showing that they could not fulfill their contract, from causes beyond their control. *Dermott* v. *Jones,* 2 Wallace, 7; *School Trustees of Trenton* v. *Bennett,* 3 Dutcher, 518; *Adams* v. *Nichols,* 9 Pick. 276; *Bullock* v. *Dommitt,* 6 Term R. 657; *Breckwick Co.* v. *Pritchard,* 6 Term, 752; *Bebe* v. *Johnson,* 19 Wend. 502; *Beal* v. *Thompson,* 3 Bos. & Pull. 420; *Paradine* v. *Jane,* Aleyn's Sel. Cas. 27; *Harmony* v. *Bingham,* 2 Kern. 115.

There being no exception in this bill of lading, because of the accumulation of cars at Cairo, the company can not excuse themselves from the obligations resulting from the written contract, on that ground. The case of *Wibert* v. *The New York & Erie Railroad Co.* can not be regarded as the settled law of New York. See the opinions of Chief Justice Gardner and Judge Hand, in that case, 2 Kern. 254, and *Read* v. *Spaulding,* 30 N. Y. 639.

Mr. Justice Walker delivered the opinion of the Court:

This was an action on the case, against appellants, as common carriers, alleging a neglect of duty, in failing to deliver a number of car loads of corn at Cairo, within a reasonable time after receiving it for transportation, whereby it became heated and of little or no value. It appears that appellee sold to Cobb, Christy & Co. and Cobb, Blaisdale & Co., who had contracted to the government, through Fallis, their agent, two lots of corn of 10,000 bushels each. The sale was made some time in January, 1865, 10,000 bushels to be delivered on the cars by the twentieth of February, and the balance by the first of March of that year. The lot last to be delivered, was at the price of $1.07 per bushel. The first lot was delivered within the specified time, and some three thousand bushels of the last lot. Afterwards, the time was extended for the delivery of the remainder until the tenth of April, 1865. When placed on the cars, and receipts taken, the corn was to be paid for by the purchasers, on the delivery of the receipts to Fallis, but appellee was to stand the government inspection at Cairo. The corn which was put on the cars after the first of March, and before the tenth of April, in fulfilment of the agreement, is the subject of this controversy, as well as corn shipped in May.

Appellee seems to have had the amount of grain necessary to fill this contract, and had it placed on the cars of appellants before the tenth day of April, 1865. He, at the time, took receipts or freight bills from the company, specifying the amount each car contained; that Gildersleve shipped the larger portion at Hudson, and the remainder at El Paso; that the corn was then sound and in good condition. At the time of the various shipments, the employees of the company gave regular shipping receipts. These all seem to have been given prior to the ninth day of April, but four other cars were loaded on the sixteenth and seventeenth days of May, which, so far as we have been able to discover, constituted a separate

5—54th Ill.

transaction, but it seems, from the evidence, like the other, to have become worthless by delay in its delivery, or at least a portion of it. The evidence shows that no portion of the first cars arrived in Cairo in less than eleven days, and the last of it as much as forty-five days. It appears, from the evidence, that the usual time required to run freight from the points where this corn was shipped to its destination, was from two and a half to three days.

A large portion of the corn thus shipped, when it arrived in Cairo, was spoiled from heating, and was sold in its damaged condition, and netted but seven cents per bushel.

The jury have found that the damage sustained by appellee grew out of the failure of appellants to deliver the corn at Cairo within a reasonable time; and a careful examination of the evidence clearly shows, that had the corn been transported in the usual time, it could not have heated before its arrival at Cairo, and that it was customary for the government officer to inspect such grain within twenty-four hours after its arrival. It is, therefore, clear, that had this grain been transported in the usual time, appellee would not have sustained any loss; and inasmuch as appellants are common carriers, subject to all liabilities and burthens incident to that business, they must be held responsible for all losses sustained by reason of any neglect of duty on their part, unless they have limited their liability by special agreement, or they have shown such a state of facts as the law holds an excuse for failing to deliver this grain within a reasonable time. No principle of law is better recognized or more firmly established, than that a common carrier is bound, in the transportation of goods, to deliver within a reasonable time, and a failure to do so renders them liable for all proximate damages which may ensue.

The receipt given by the company for this grain, contains a number of conditions, none of which, however, can apply to this character of property. If it were contended that it falls within the clause which releases them from loss on perishable property, it can not be allowed, as grain can not be held to be

of that nature.    All know that with reasonable care, corn can be preserved for many years.    In one sense, nearly all things are perishable, as grain, vegetables, timber, animals, and even many kinds of metal perish, or cease to retain their usual character.    Perishable property, in the commercial sense, is that which, from its nature, decays in a short space of time, without reference to the care it receives.    Of that character, are many varieties of fruits, flowers, some kinds of liquors, and numerous vegetable productions.    But to say mature, merchantable corn was of that character, would be a perversion of language.    This clause does not, therefore, govern the loss in this case.

It is, however, insisted that the general government had military possession of the road, and that the company can not be held liable for the delay and the injury resulting therefrom. Appellants, to prove the defense, read in evidence an order from the war department, which declares that by virtue of the authority conferred by act of congress, the president takes military possession of all railroads in the United States, from and after the twenty-fifth of May, 1862, the date of the order, and directs the respective railroad companies, their officers and servants, to hold themselves in readiness for the transportation of troops and munitions of war, as may be ordered by the military authorities, to the exclusion of all other business.

On the twenty-fourth of December, 1863, Major General Grant, in command of the army of the Mississippi, issued an order defining the regulations to be observed by railroads.    It orders that the quartermaster's department shall have control of military railroads so far as relates to the transmission of military freight and military passengers, with power to exclude such other freight and passengers as may be deemed necessary.

The chief quartermaster, Allin, on the eleventh of January, 1864, addressed an order to Colonel Myers, chief quartermaster at St. Louis, in which he states that owing to the obstruction to river navigation, the full force of all railroads leading from the source of supply, is required, and names the Illinois

Central as one of those roads, and directs that whatever government freight he might have at any point for shipment over that road, must be carried to the exclusion of all private property, if necessary; that whatever supplies the government may have contracted for, or might thereafter contract for, should take precedence of private freight. He also directs that requisition be. made upon the agents of the Illinois Central Railroad to the full extent of their capacity, if necessary, for transportation. Appellants also read in evidence a large number of orders from the military authorities, specially directing shipments of corn, oats and hay, running through the two last years of the war, some immediately before, and others immediately after the receipts were given for the corn in controversy.

Arthur, the general superintendent of the road, testified that in shipping freight the agents of the road obeyed military orders; that the military authorities took charge of the cars on their arrival at Cairo, and had them unloaded, and would not permit the company to discharge the freight; that in doing so, the track at Cairo became blocked to such an extent that cars could not be run into the city. He states that appellee and Fallis came to him in the latter part of March, or first of April, 1865, to procure transportation for this grain; that having orders from the military authorities to ship for Cobb, Blaisdale and Co. and O. P. Cobb, Christy & Co., he stated that he would furnish cars if they should be promptly at Cairo to attend to unloading them; that the cars were so furnished.

Forsythe, the general freight agent of the road, testified that he acted under the orders of the quartermaster's department, and did not look to the directors of the road for orders in shipping freight; that but few cars went through to Cairo, except upon military orders; that the government was not able to unload the cars at Cairo, and freight accumulated at that point and along the entire length of the road; that government could not unload them as fast as the company could deliver them at Cairo; that government took about sixty cars

a day during the month of April, and about forty-five to fifty per day during the month of May, 1865; that the company could have sent in from two hundred and fifty to three hundred cars per day, and have unloaded two hundred to two hundred and fifty per day, had the government not interfered; that the side tracks at Cairo would hold from two hundred and fifty to three hundred cars, and there were, at that time, about eight hundred along the line of the road. He states that he might have started these cars, but would perhaps have to stop them at Decatur, as he could not get into Cairo on account of its being blocked with cars.

He states that when corn was rejected, it was not unloaded by the government, but was cared for by the owner or consignee, or sold by the company to pay freights; that a large portion, perhaps one-half the corn which came to Cairo that spring, was rejected on its inspection.

Johnson, the freight agent at Cairo, stated that all the grain which passed inspection was taken charge of by the government, and was unloaded by the quartermaster. But all that was rejected was thrown back on other parties; that a large portion of the rejected corn had to be taken care of by the company, because the consignees refused to receive it, and that it was then their duty to take care of it, to secure the charges for freight. He thinks there was a time when fifty per cent of what was brought to Cairo was rejected, but is unable to say what was the proportion in April and May of that year. He, as well as both the other witnesses, say that the corn was generally inspected within twenty-four hours after its arrival in Cairo, and this witness says that it was from five days to two weeks after inspection before the rejected corn was brought around on the track to be unloaded. He says their warehouses were full, and the difficulty in disposing of this grain arose from a want of room for its storage; that a portion of this rejected corn was placed on wharf-boats, and a part on steamboats, but they were not sufficient to hold the rejected corn, and boats were at that time scarce.

Do these facts establish the defense which has been interposed? Common carriers are held to the highest degree of diligence. It is only the acts of God or the public enemy that excuse the non-delivery of goods entrusted to their care for transportation. But while this is true of the delivery, their duty in respect to the preservation of the property from deterioration is not of so high a character. A common carrier is not liable for losses from ordinary wear and tear of goods in the course of transportation, or from their ordinary loss, deterioration in quantity or quality in the course of the voyage, or from inherent natural infirmity and tendency to damage, or which arise from the personal neglect or wrong, or misconduct of the owner or shipper of the goods. Story on Bailment, sec. 492 A. But the common carrier is bound to observe due care and diligence for the preservation of the goods from damage and deterioration. Angell on Carriers, 214. While they are insurers for the delivery of the goods bailed, they are not insurers that they shall reach their destination in the same condition in which they were shipped. They are, however, bound to use due care and diligence for the preservation of the property thus entrusted to their care. If the care which prudent men would ordinarily take of their own property be omitted, and loss ensue, then the common carrier must be held liable.

It is also true that a common carrier must deliver goods without unreasonable delay; and if damage be sustained by reason of a neglect to transport goods thus received in the ordinary time, unless excused by uncontrolable circumstances, the carrier must respond in damages for the loss. Having possessed himself of the goods to be transported, he must act in good faith, and perform the duty within a reasonable time, or be held liable for loss which ensues.

In this case, there was unusual and great delay, and that being shown, it devolves upon appellants to excuse or justify their conduct, or they must be held liable for the damages resulting from that delay. While they have shown that the military authorities gave orders or permission to ship military

stores or grain and forage designed for the use of the army, they fail to show any interference on the part of army officers which prevented the company from sending this grain forward in the usual time. No order was given, after it was received, forbidding its shipment. On the contrary, Arthur testifies that he had orders to ship grain for Cobb, Blaisdale & Co. and Cobb, Christy & Co., and had agreed with their agent, Fallis, and appellee, to furnish transportation for this grain, which he did, when it was received by the company. So far, then, from the company being prevented by the military authorities from transporting this grain, they had express permission for the purpose. The road was still operated by the employees of the company, and they gave no notice that the road was under the control of the officers of the army, nor did they stipulate in the bill of lading that any act of the military authorities should relieve them from their duty of common carriers. Hence we see no force in the position assumed, that the road was under military authority, and they were prevented from sending the grain forward, in the ordinary time required for such purpose.

Much stress is, however, laid on the fact that the track was obstructed at Cairo, with cars filled with rejected corn. The evidence shows that as soon as the inspector rejected corn, the government officers ceased to have any further control of it, or the cars in which it was loaded. It then went into the hands of the company, and the evidence shows that the company could have unloaded two hundred and fifty cars each day. If so, then we perceive no reason why the cars containing rejected corn could not have been unloaded and the blocking up of the track relieved, and the freight on the road run in, at farthest, in but a few days. The evidence shows there were but about three hundred cars on the track at Cairo, and that all grain was inspected within twenty-four hours after its arrival. Then the company, by unloading the rejected corn at the rate of two hundred cars per day, could have removed, if half of those at Cairo contained rejected corn, in one day, the cars

from the track, and thus permitted cars along the line of the road to have gone forward, and in a few days at most, all the grain could have been taken to Cairo.

It is however, urged that the military authorities would not permit the employees of the company to unload the grain which had passed inspection. We do not perceive in what respect that could prevent the company from unloading the rejected corn. But it is urged that the warehouses and other available room of the company were full, and there was no place within which to store this damaged corn, except by permitting it to remain on the track in the cars. We do not conceive this to be an answer.

The company had not stipulated, in their bills of lading, against such a contingency, even if they could have thus escaped liability. It would seem that the object of retaining the damaged corn, was to obtain their freights from its sale ; and even if it could not be stored, they should have submitted to the loss by throwing it away, rather than impose it upon appellee, whose grain they had undertaken to deliver without unreasonable delay. Their interest or mere convenience in nowise excused them from the delivery of appellee's corn. Had the damaged corn on the track been thrown out and abandoned, the track would thus, no doubt, have been free from obstruction, and the produce on the line of the road could have gone forward, and this grain would not have spoiled.

Having received this grain for transportation, without stipulations for any contingencies, and being in nowise under the *vis major*, we can but hold that appellants have failed to relieve themselves from their liabilities as common carriers. If entirely under military control, why was this grain received ? It was received and receipted for in the usual course of their business, and by so doing they held themselves out to the world as common carriers, and having done so, they must be held to the liability which that relation imposes. Had they not intended to assume such responsibility, they should have

refused to receive the grain, or limited their liability by their bills of lading.

The road still retained its character of a common carrier. The military authorities only required the company to give a preference, in transporting property, to that designed for the use of government, and this grain was intended for that purpose. Cobb, Blaisdale & Co. and Cobb, Christy & Co. were large government contractors for the supply of forage, and had purchased this corn for the use of the army, and appellants were not restrained by the general military orders from its transportation, but, on the contrary, were expressly permitted to deliver it in Cairo. The jury have found that the fault of appellants alone prevented its proper delivery.

The instructions given for appellants were all they had any right to ask. They stated the law perhaps more favorably than could be sustained by the authority of adjudged cases. Of these instructions, therefore, they have no right to complain. Nor do we perceive any objections to the instructions given for appellee. In any view which we have been able to take of this case, we are unable to see that appellants are not liable.

But there were three car loads of corn shipped on the sixteenth and seventeenth of May, more than a month after the time expired within which appellee had the right, under the agreement, to ship to Cobb, Blaisdale & Co. Whether it was in fulfillment of that contract, does not appear. If it was not, and Cobb, Blaisdale & Co. were not bound to receive it, then the price they were to pay appellee could not control in assessing damages. In that event, the market price at Cairo, at the time the grain should have reached there, would form the basis for estimating the damages. It does not follow, that because Cobb, Blaisdale & Co. were to pay $1.07 per bushel for corn shipped before the tenth of April, that they were to pay the same price for corn shipped more than a month later, after the time had expired for appellee to fill his contract, or that sum was the market price at Cairo.

The evidence fails to show whether these three car loads of corn were delivered under the contract, or on some other account. Had it appeared that Cobb, Blaisdale & Co. had extended the time until the corn was placed on the track, then the assessment was right. But there is no evidence from which this can be inferred. If shipped on some other account, then the market price in Cairo, or the contract price under which it was shipped, if one existed, must govern. For the want of evidence to show the value of these three car loads of corn, the assessment was wrong, and is unsupported by the evidence, and the court below erred in refusing to set the verdict aside, and in not granting a new trial, and the judgment must be reversed and the cause remanded.

*Judgment reversed.*