THE MERCHANTS' INSURANCE COMPANY OF CHICAGO

*v.*

EZEKIEL MORRISON.

1. MARINE INSURANCE—*implied warranty.* By the rules of the law merchant and the common law, every voyage policy of insurance of a vessel implies a warranty of seaworthiness, and this warranty relates to the beginning of the risk, and that is when the vessel sails. Seaworthiness at the commencement of the voyage is a condition precedent, and if it does not then exist the policy is void, and the insurers are not responsible for a subsequent loss, even if it arises from another cause.

2. SAME—*extent of warranty.* This implied warranty imports that the ship is staunch and sound; of sufficient materials and construction, with sufficient sails, tackle, rigging, cables, anchors, stores, and supplies; a captain of competent skill and capacity; a competent and sufficient crew; a pilot when necessary, and, generally, that she is, in every respect, fit for the voyage insured.

3. SAME—*time policy*. But when a. vessel was insured from the 1st day of April to the 30th day of November, 1869, against perils of the lakes, rivers, canals, fires, and jettison, excepting all losses, perils, misfortunes or expenses arising from incompetency of the master or insufficiency of the crew, or want of ordinary care and skill in navigating the vessel, and in loading, stowing, and securing the cargo, rottenness, inherent defects, overloading, and all other unseaworthiness, etc., and the policy contained an express warranty that the vessel was then in safety, and as to the business for which she was to be used, and the same was destroyed by fire while in port, not resulting from unseaworthiness : *Held*, that this being a time policy, as distinguished from a voyage policy, the law did not imply a warranty that the vessel should be seaworthy when she set out upon her first voyage, and that the company was liable for the loss.

4. CONTRACT—*presumption*. It is a general rule of law that when parties have deliberately put their engagements in writing, in such terms as import a legal obligation, without any uncertainty as to the object or the extent of such engagement, it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking was reduced to writing. In such case to add to it by implication would be to vary its terms and legal effect.

APPEAL from the Superior Court of Cook County.

Messrs. HITCHCOCK, DUPEE & EVARTS, for the appellant.

Mr. H. S. MOORE and Mr. SIDNEY SMITH, for the appellee.

Mr. JUSTICE McALLISTER delivered the opinion of the Court:

In June, 1868, the appellee, being engaged in the lumber business at Muskegon Lake, in Michigan, became the owner of the then propeller " Omar Pacha."

This lake is situated some five miles from the east shore of Lake Michigan, is connected with the latter by a navigable river called the Muskegon River ; constitutes a safe harbor, and is known as the Port of Muskegon. During the remainder of the season of 1868, after appellee became the owner, the propeller was employed by him in the lumber trade between that port and Chicago ; at the close of navigation the vessel was

taken to the Muskegon harbor, where she remained until the 10th of April, 1869 ; during the winter of 1868–69 she was thoroughly overhauled, repaired, and changed into a lumber barge, the work and repairs costing upward of ten thousand dollars.  On the 1st of April, 1869, while the vessel was still in that harbor, through the action of an insurance agent and solicitor a policy of insurance upon the body, tackle, apparel, and other furniture of this vessel was issued by appellant to appellee, insuring the same in the sum of three thousand dollars, from noon of. the 1st day of April, 1869, to noon of the 30th day of November, 1869.  This was a valued policy, containing an express warranty on the part of the assured that the vessel was then in safety ; that she was to be employed exclusively in the freighting and passenger business, and to navigate only the waters, bays, harbors, rivers, canals, and other tributaries of Lakes Superior, Michigan, Huron, St. Clair, Erie, and Ontario, and River St. Lawrence to Quebec, usually navigated by vessels of her class during the portion of the life of the policy between noon of April 1st and noon of November 30th.

The perils insured against were of the lakes, rivers, canals, fires, and jettison, excepting all perils, losses, misfortunes, or expenses consequent upon, and arising from or caused by the following or other legally excluded causes, viz. :    *   *   " Incompetency of the master, or insufficiency of the crew, or want of ordinary care and skill in navigating said vessel, and in loading, stowing and securing the cargo of said vessel, rottenness, inherent defects, overloading, *and all other unseaworthiness,"* etc.

The policy contained the usual recital of payment of the premium.

The vessel remained in the port where the repairs had been made, where she was at the time the policy was issued, until the 10th day of April, 1869, when, being laden with a cargo of lumber, she set out upon a voyage to Chicago.  She continued engaged in the lumber trade between those ports until the 8th day of October, 1869, and then, while lying at a dock in the

Muskegon harbor, and during the life of the policy, she was consumed by fire, not the result of unseaworthiness.

The usual protest, proof of loss and abandonment necessary to charge the underwriters, having been made and the appellant having refused to pay the amount insured, this action was brought upon the policy. The cause was tried before the court and a jury ; after hearing the evidence, which was conflicting, the jury returned a verdict in favor of the assured, upon which judgment was rendered, and the case brought to this court by appeal.

A single question of law has been presented and discussed in this court. Upon the trial the court permitted the insurance company to introduce evidence tending to show the want of seaworthiness of the vessel during the season of 1869, but with the avowed purpose of showing that she was unseaworthy at the time of setting out upon her first voyage after the insurance. Many witnesses were examined as to this point, upon both sides ; but when we consider the presumption of law that she was seaworthy, the clear and satisfactory evidence of the thorough overhauling and repairs which she had received immediately previous to setting out upon such voyage, and contrast the strength of appellee's case with that sought to be made by appellant, it seems to us that the clear weight and preponderance of evidence are with the appellee. Nevertheless, there was sufficient to warrant appellant in asking the court to submit the question of fact to the jury, if the counsel were right in their law as involved in the following instruction, which the court refused :

" The jury are instructed that the law implies a warranty on the part of the plaintiff that the 'Omar Pacha' was seaworthy on setting out upon her first voyage after the time from which the policy was to take effect, provided she set out on such voyage from a port in which proper repairs could have been made ; and if they believe, from the evidence, that she was not seaworthy when she left such port on such voyage they will find for the defendant."

The refusal to give this instruction forms the basis of appel-

lant's argument. The policy, we have seen, was made on the first day of April, 1869, whereby the vessel was in terms insured against certain perils, among which were those of fire, from noon of that day. Under these circumstances, did the law imply a warranty that the vessel should be seaworthy when she set out upon her first voyage from that port; and was it requisite that she was seaworthy at that time, in the sense of that term as applied to voyage policies, in order to make the policy attach and charge the insurer for a subsequent loss by fire not arising from want of seaworthiness? We think not. To so hold would not be the mere recognition of a condition to the policy by implication of law, and in respect to which the contract was silent, but would be to vary its terms and legal effect.

It is a general rule of law that when parties have deliberately put their engagements into writing in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties, and the extent and manner of their undertaking, was reduced to writing. 1 Greenleaf Ev. Sec. 275.

There was no attempt to interpret or explain any of the terms of the policy by offering proof of any known and established usage respecting the subject, so that the position assumed must have its foundation, if it have any, in the peculiar rule of the law merchant and the common law—that every voyage policy implies a warranty of seaworthiness. Then, what is that warranty? It imports that the ship is staunch and sound, of sufficient materials and construction, with sufficient sails, tackle, rigging, cables, anchors, stores, and supplies; a captain of competent skill and capacity; a competent and sufficient crew; a pilot when necessary, and, generally, that she is, in every respect, fit for the voyage insured. This warranty relates to the beginning of the risk, and that is when the vessel sails. 2 Greenleaf Ev. Sec. 400; 3 Kent's Com. 289.

And it is the general rule that the vessel must be seaworthy in the sense mentioned, at the commencement or inception of

the risk, in order that the policy attach and charge the insurer.
Seaworthiness at the commencement of a voyage is a condition
precedent, and, if it does not then exist, the policy is void, and
the insurers are not responsible for a subsequent loss, even if it
arises from another cause. *Prescott* v. *U. S. Ins. Co.*, 1 Whart.
399; *Starbuck* v. *N. E. Ins. Co.*, 19 Pick. 199; *Capen* v. *Wash-
ington Ins. Co.*, 12 Cush. 517.

These are inflexible, arbitrary rules of the common law, and
are as applicable to risks of that character upon our lakes as
upon the high seas. But their applicability to time policies
was seriously questioned, if not denied, in *Capen* v. *Washing-
ton Ins. Co.*, above cited; and Chief Justice Shaw pointed out
some of the distinctions between the two kinds of policies with
his usual clearness and force. Afterward, the case of *Gibson*
v. *Small* came up in the English House of Lords (24 Eng. L.
& Eq. 17), involving the question of implied warranty of sea-
worthiness in the case of a time policy, in the sense of its appli-
cation to a voyage policy. The subject was most elaborately dis-
cussed by the several judges, and the distinguishing features of
the two kinds of instruments were pointed out with admirable
perspicuity. There, however, the policy was upon a vessel in
an unknown sea, and in an unknown condition; but in the case
of *Thompson* v. *Hopper* (6 El. & Bl. 172; 34 Eng. L. & Eq.
266) the action was upon a time policy issued upon a vessel in
port where the owner resided, and the court held that there
was no implied warranty of seaworthiness which, if broken,
would prevent the policy from attaching. See, also, *Jones* v.
*Ins. Co.*, 2 Wallace, Jr., 278.

The question was examined in the English courts with so
much research and ability that it would be idle, if not pre-
sumptuous, to attempt to throw any further light upon it;
but it seems to us that the reasons assigned by the English
judges against the implication of such a warranty in the case
of time policies on vessels engaged in the general and cease-
less commerce of the great oceans or high seas, apply with
even greater force to those on vessels engaged upon our north-
western lakes, because here, from the rigor of the climate,

vessels are generally compelled to lie, during the cold season, some four or five months in ports or harbors, imbedded in ice, and where the principal peril to which they are exposed is that of fire, and against which it is lawful for the owner to obtain insurance. But the circumstances would require a policy essentially different from the usual voyage policy. It might be expedient to make the policy cover the whole time during which the vessel was to so lie in harbor, and also that of the ensuing season of navigation. To be fully applicable to the circumstances, the policy should be made to cover the perils of fire as well as of the lakes, rivers, etc. Suppose the owner, while his vessel is fast in the ice of a Michigan or Chicago port, should obtain a policy on the first day of January, insuring her against all the perils suggested from noon of that day until noon of the thirtieth day of the following November, would there be any reason in support of the position that such a policy implied a warranty of seaworthiness as that warranty has been defined, or for holding that the operation of the policy was suspended; that the risk did not commence until the vessel set out upon her first voyage in the spring; and that, if she was not *then* seaworthy, the policy never attached at all? Yet that is the precise doctrine of appellant's instruction. It is manifest that to so hold would be to say that, upon this subject, parties were not competent to make such a contract as they thought fit; that whatever might be the necessities of the case or the terms of their contract, still the law would so control it as to make it speak a particular language, and *that* the same as another contract, which they did not make. The policy would declare, in plain language, that the risk commenced, and the policy became operative, at noon of the first day of January; but the courts, that the risk did not commence, or the policy become operative, no matter how fairly obtained, unless the vessel was seaworthy when she sailed upon her first voyage in the spring.

This is the proposition embodied in the instruction which appellant's counsel asked the court to give, the refusal of which, by the court, they have endeavored to convince us,

was error.  The instruction is not based, it will be observed, upon the hypothesis, that the vessel was about to depart on a voyage when the policy issued ; and the principle involved in it is all the same, whether the policy was made ten days or three months before the vessel sailed.

It would lead to great embarrassment if the vessel owner can not obtain a policy like that in question without its being arbitrarily subjected to the same rules incident to voyage policies.  Aside from the circumstance of the vessel lying ice-bound for several months, is the further circumstance, that much of the commerce upon the lakes is carried on between ports which are not remote from each other.

Hence, voyages are short and quickly and frequently made.  In such case there would be an obvious inconvenience in the use of voyage policies.  This inconvenience, together with the other peculiarity of navigation upon the lakes we have mentioned, dictate the propriety of seeking a substitute for the usual voyage policy, in another form of contract, which, in the very necessities of the case, must be substantially different.  Such a contract is the one sued upon in this case.  We are of the opinion that the vessel owner, if insurance companies choose to concur in his wishes, has the legal right to adopt the substitute and enjoy it, if fairly obtained, untrammeled with the incident which the law attaches to a voyage policy.

There was, therefore, no error in the rulings of the court below, the evidence sustains the verdict, and the judgment must be affirmed.

*Judgment affirmed.*