ILLINOIS CENTRAL RAILROAD COMPANY
v.
GEORGE W. SCHWARTZ, use, etc.

1. COMMON CARRIER—RIGHT OF CONSIGNOR TO SUE.—Whether the consignor retains any property in the goods or not, if the contract for the transportation by the carrier is with him, he may maintain the action upon such contract in his own name for the failure safely to carry and deliver to the consignee, but the recovery in such case will be for the benefit of the consignee, if he was the real owner of the goods. And the fact that the bill of lading states, in this case, that the corn was to be delivered " on account of Fallis," does not render it any the less the contract of the parties making it.

2. JUDGMENT—WHEN CONCLUSIVE.—A suit may be maintained against a common carrier in the name of any one having either a general or special property in the goods, and an action properly instituted by any one having such a right of action will be a bar to any subsequent suit against the carrier at the suit of another party having either a general or special property in the same goods; but no such judgment can be effectual as a bar unless the plaintiff in the first suit had a right of action to recover the same damages sued for in the second suit.

3. CARRIER VOLUNTARILY ASSUMING LIABILITY.—While appellant's road was so far under the military control of the government at the time the grain in question was shipped, that it was not liable as a common carrier, unless it voluntarily assumed that responsibility, yet, if the company thought proper, notwithstanding this control, to receive freight and issue its bills of lading for the same without containing any exception as to the governmental

control, it thereby voluntarily assumed the duties of a common carrier, and would be subject to the liability attaching to that function.

4. WRITTEN CONTRACT—VERBAL EVIDENCE INADMISSIBLE.—The contract of shipment sued on, can not be altered or changed by any previous verbal agreement of the parties not incorporated into it. Except in the recital or the acknowledgment of the goods and of their quantity and the condition when received, bills of lading are strictly written contracts between the parties, and come within the general rule which prohibits the introduction of parol evidence to contradict or vary written contracts.

5. LIABILITY OF CARRIER.—Appellant was not relieved from its obligation to deliver the corn in what would, ordinarily, be a reasonable time, because of the extraordinary state of circumstances then existing, since all the facts were as fully known to the carrier at the time it assumed the responsibility, as they were afterward.

6. SAME—PERISHABLE FREIGHT.—While it is true that the corn would perish from its own tendency to decay when shipped in the manner described, if kept in close cars long enough, appellant can not escape liability on the ground of inherent decay, since it is certain from the evidence, that it would not have been damaged from this cause, had it been delivered within a reasonable time.

APPEAL from the Circuit Court of McLean county; the Hon. O. T. REEVES, Judge, presiding. Opinion filed November 20, 1883.

Messrs. WILLIAMS, BURR & CAPEN, for appellant; that the judgment in the former suit is a bar, cited Forbes v. B. & L. R. R. Co. Am. & Eng. R'y Cases, April, 1883, p. 76; Conger v. Chilcote, 42 Ia. 18; Stoddard v. Thompson, 31 Ia. 80; McNamee v. Moreland, 26 Ia. 97; Finn v. Western R. R. Co. 112 Mass. 524; I. C. R. R Co. v. Cobb, 64 Ill. 132; Green v. Clark, 12 N. Y. 343; Calkins v. Allerton, 3 Barb. 171; Bigelow on Estoppel, 47, 61, 63, 77; State v. Hunter, 3 Strob. Eq. 136; Kent v. H. R. R. R. Co. 22 Barb. 278; 1 Greenleaf on Ev. § 535; White v. Bascom, 28 Vt. 268; 2 Smith's Leading Cases, 435; Kitchen v. Campbell, 3 Wis. 304; Crow v. Bowlby, 68 Ill. 23; Miller v. L. & M. T. Co. Chicago Legal News, Oct. 1, 1881, p. 18.

No man can take advantage of his own wrong: Broom's Legal Maxims, 209; Wright v. I. & M. Tel. Co. 20 Ia. 195.

As to a common carrier's duty to carry for all alike: Angell on Carriers, §§ 68, 123–129; Story on Bailments,

§ 495; Dwight v. Brewster, 1 Pick. 50; Bouvier's Law Dict. Art. Common Carrier; 2 Redfield on Railways, 3, 9, 67; Hutchinson on Carriers, §§ 47, 48.

A common carrier is not required to provide for an unforeseen emergency, or an unexpected accumulation of freight: G. & C. U. R. R. Co. v. Rae, 18 Ill. 488; Wibert v. N. Y. & E. R. R. Co. 2 Kern, 245; 2 Redfield on Railways, 163; Story on Bailments, § 591; Conger v. H. R. R. R. Co. 6 Duer, 375; Hutchinson on Carriers, §§ 114, 292.

Where the State takes control of the person or means of transportation of the carrier and compels him to act under its direction, he ceases to be a free agent, and as long as this coercion continues, he is not a common carrier: Bliven v. Hudson R. R. R. Co. 35 Barb. 188; Hadley v. Clark, 8 T. R. 259; Angell on Carriers, § 293.

At the time of the grievance complained of, appellant was not a common carrier: I. C. R. R. Co. v. Ashmead, 58 Ill. 487; Same v. McClellan, 54 Ill. 58; Same v. Cobb, 64 Ill. 128; Same v. Cobb, 72 Ill. 148; Same v. Hornberger, 77 Ill. 457; Same v. Phelps, 4 Bradwell, 238; Cobb v. I. C. R. R. Co. 88 Ill. 394; Phelps v. Same, 94 Ill. 548.

A carrier is not responsible for a delay occasioned by the fault of a third party: Conger v. H. R. R. R. Co. 6 Duer, 375.

As to the measure of damages: King v. Gilson, 32 Ill. 348; Bridgeman v. Steamboat Emily, 18 Ia. 509; Mather v. Butler Co. 28 Ia. 253; Winnie v. I. C. R. R. Co. 31 Ia. 583; Gilbert v. Wiman, 1 Comst. 550; Aberdeen v. Blackmar, 6 Hill, 324; Angell on Carriers, § 490; Sedgwick on the Measure of Damages, pp. 28, 200; Loker v. Damon, 17 Pick. 280.

As to the duty of the carrier where the consignee fails to receive the goods at the point of destination: 1 Redfield on Railways, pp. 52, 53; Angell on Carriers, §§ 291, 502; Porter v. C. & R. I. R. R. Co. 20 Ill. 407; Crawford v. Clark, 15 Ill. 561; Ostrander v. Brown, 15 Johns. 39; Hemphill v. Chenie, 6 W. & S. 62; G. W. R'y Co. v. Crouch, 3 H. & N. 182; Thomas v. B. & P. R'y Co. 10 Metc. 472.

In the absence of any time stipulated in a contract for its performance, the law says it must be performed within a reasonable time under all the circumstances: Wibert v. N. Y. & E. R. R. Co. 12 N. Y. 245; G. & C. U. R. R. Co. v. Rae, 18 Ill. 488.

Messrs. Weldon & Benjamin and Mr. Hamilton Spencer, for appellee; that the former judgment is not a bar, cited Case v. Reeves, 14 Johns. 81; Hunt v. Haven, 52 N. H. 170; Crawford v. Hall, 16 N. Y. 575; Comyn's Digest, Evidence A. 5; Doe v. Earl of Derby, 1 A. & E. 783; Kirkpatrick v. Stringley, 2 Ind. 259, 273; Ind. & C. R. R. Co. v. Clark, 21 Ind. 150; Church v. Claflin, 35 Vt. 223, 231; Packet Co. v. Sickles, 5 Wallace, 580, 592; Chrisman v. Harman, 29 Grattan, 494, 499: Akin v. Peck, 22 Vt.; Hooker v. Hubbard, 102 Mass. 245; Supples v. Cannon, 44 Conn. 428; Duttin v. Woodman, 9 Cush. 261.

As to the question of military interference: I. C. R. R. Co. v. McClellan, 54 Ill. 58.

As to parol evidence being inadmissible to vary the written contract: 1 Greenleaf on Evidence, § 275; Merchants Ins. Co. v. Morrison, 62 Ill. 242; Bayard v. Malcolm, 1 Johns. 467.

As to the claim that the corn perished by its own inherent weakness: I. C. R. R. Co. v. McClellan, 54 Ill. 58.

Higbee, J.  This case was before us at the May term, and reversed for the want of certain proof then deemed necessary, which is supplied by the record now before us.  I. C. R. R. Co. v. Schwartz, 11 Bradwell, 482.

The action is assumpsit on a shipping receipt, or bill of lading as it is called, given by appellant to appellee for corn shipped from Winona to Cairo from March 30, to April 10, 1865, consigned to Cobb, Christy & Co., on account of E. Fallis.  The damages sued for are alleged to have resulted from the failure to deliver the corn at Cairo, within a reasonable time, by reason whereof it was heated and spoiled, and of no value.

It is one of the numerous cases against the Illinois Central Railroad, several of which have been before the Supreme

Court, brought for its alleged violations of duty in failing to deliver large amounts of grain intended for the use of the army during the late civil war. It was said in argument that there are some twenty cases, involving large sums of money, still pending, awaiting the result of this suit, and in view of this fact we have thought it proper in affirming the judgment to give the reasons in writing which have led to this result, so that they may be the better understood by the parties in interest.

When the case was here before, we expressed some doubt whether the plaintiff below had any such right or interest as entitled him to maintain the suit in his own name, he having loaded the corn on the cars, taken a bill of lading in his own name and turned it over to Fallis in pursuance of the terms of a contract previously entered into between them, by which the corn was to be the property of Fallis when loaded. A more careful examination of the authorities confirms us in the opinion then expressed that the suit could be maintained in the name of appellee. In Blanchard v. Page, 8 Gray, 281, the plaintiffs, merchants, sold goods to a party for which they were paid at the time by the purchaser, and shipped them to him, taking from the carrier a bill of lading purporting to be a contract with the plaintiffs to carry the goods according to their directions, which were to carry and deliver them to the purchaser. The goods were lost, and an action was brought by the shippers against the carrier for their value on the contract in the bill of lading. It was admitted that the plaintiffs had no interest in the goods at the time of the shipment, and it was contended that they could not maintain the action. But it was held, in a very elaborate opinion by Shaw, C. J., that, independently of any interest or property in the goods, the action could be maintained upon the contract, and it is said by Hutchinson on Carriers, Sec. 725, that this case has been adopted and followed by the appellate courts of Wisconsin and Mississippi in Hooper v. The Railway, 27 Wis. 81, and Southern Express Co. v. Craft, 49 Miss. 409; and in the latter case it was held that the action might be maintained by the shipper or con-

signor who had no property in the goods, either general or special, and had incurred no risk in the bailment although it was provided by statute that any action should be brought in the name of the real party in interest. " The shipper," as was said, " is a party in interest to the contract, and it does not lie with the carrier who made the contract with him to say, upon a breach of it, that he is not entitled to recover the damages, unless it be shown that the consignee objects; for without that, it will be presumed that the action was commenced and is prosecuted with the knowledge and consent of the consignee and for his benefit."

In Dunlap v. Lambert, 6 Cl. & Fin. 610, it was said by the Lord Chancellor, " that although generally speaking where there is a delivery to a carrier to deliver to a consignee, he is the proper person to bring the action, yet, if the consignor made a special contract with the carrier the special contract supersedes the necessity of showing the ownership of the goods, and the consignor, the person making the contract with the carrier, may maintain the action, though the goods may be the goods of the consignee." It can not be denied that there is a conflict in the authorities upon this subject, many of the cases following the rule laid down in Dawes v. Peck, 8 T. R. 330, where the right of action is made to depend on the plaintiff's interest in the subject-matter of the suit, and the right of the consignor to sue, where he has no interest in the goods, is denied.

After reviewing the cases above cited and many others, Hutchinson in Sec. 736 of his excellent work on Law of Carriers says, " It may therefore be concluded, first, that when the risk of the safe transportation of the goods is upon the consignor, he will be considered as the owner for the purpose of maintaining an action against the carrier for their loss or injury. Secondly, that whether he retains any property in the goods or not, if the contract for the transportation by the carrier is with him, he may maintain the action upon such contract in his own name, for the failure safely to carry and deliver to the consignee; but that the recovery in such case will be for the benefit of the consignee, if he was the real

owner of the goods. Thirdly, that the law will presume, when nothing appears to the contrary, that the consignee is the owner of the goods, and that the contract for their transportation was made with him as such owner; but this presumption may be rebutted by showing the actual facts or the intention of the parties to the contrary. Fourthly, that the consignee, who had no property in the goods, either general or special, and incurred no risk in their transportation can not maintain an action for their loss or damage."

The receipt given by appellant for the corn is in the usual form and possesses all the essential requisites of a technical bill of lading, except that the carriage is by land instead of water. Notwithstanding this difference, it is to be governed by the rules applicable to bills of lading; it is a receipt to the plaintiff for the corn and a contract with him for its safe carriage and delivery to the consignees at Cairo within a reasonable time and in like good condition as received by the carrier. The fact that it states that the corn was to be delivered on the account of Fallis does not render it any the less the contract of the parties making it, and although Fallis, the owner of the corn, could sue in case for the non-performance of the common law duties imposed upon the carrier, no good reason appears why an action of assumpsit can not be maintained in the name of the plaintiff for the benefit of the owner, upon the contract made with him. In the case of G. W. R. R. Co. v. McComas, 33 Ill. 185, it was held by the Supreme Court of this State that the carrier could not dispute the title of the consignor. See also N. L. P. Co. v. Shearer, 61 Ill. 263.

It is next contended by appellant's attorneys that appellee's right of action was barred by a judgment against Cobb, Christy & Co., the consignees in said bill of lading, in an action on the case brought by them against appellant as a common carrier to recover damages for the alleged unreasonable delay in delivering the same corn in controversy in this suit. The corn was sold by appellee, Schwartz, to Fallis, to be delivered on the cars consigned to Cobb, Christy & Co., government contractors at Cairo, and to be paid for by bills drawn by

Fallis on the consignees.   The contract between Fallis and Cobb, Christy & Co., was that the corn was to be inspected by a government inspector on its arrival at Cairo, and when it passed inspection they were to receive it and pay the contract price.   The corn did not pass the inspection, was never delivered to the consignees, nor did they ever make any payment on it.   Upon this evidence the central question presented to the jury at the trial of that case was, had Cobb, Christy & Co. such an interest in the corn, either general or special, as to give them a right of action against the carrier for a failure to deliver it in a reasonable time; and the jury by their verdict found they had not, upon which a judgment was rendered against them for costs, and the judgment was affirmed by the Supreme Court.   88 Ill. 394.

Schwartz contributed what he could in giving information and hunting up evidence to support that suit, and was to share in the benefits of the judgment in case it was successful.   He no doubt thought Cobb, Christy & Co. had a right of action and expected them to recover; but he was not a party to the suit, nor can he be regarded as a privy, his right or title to the property not having been acquired since that suit was commenced either from Cobb, Christy & Co. or any one else bound by the judgment.   It is unquestionably the law that a suit may be maintained against a common carrier in the name of any one having either a general or special property in the goods, and that an action properly instituted by any one having such a right of action will be a bar to any subsequent suit against the carrier at the suit of another party having either a general or special property in the same goods.   Redfield on Carriers, Sec. 321.   No such judgment, however, can be effectual as a bar unless the plaintiff in the first suit had a right of action to recover the same damages sued for in the second suit.   The same evidence that was given in the former suit is before the court, in this case, and was held by the Supreme Court to establish no right of action in Cobb, Christy & Co.   Having no interest in the subject-matter of the suit, they had sustained no damages, and were entitled to no judgment.   In that suit the merits of the

present controversy could not have been tried, and to hold that judgment to be a bar to this suit would be to deny all remedy for the alleged injury. This the law will not do.

The next ground urged by counsel for reversing the judgment is as follows:

" II. Our second ground of reversal is on the evidence. That is, as has been repeatedly held by our Supreme Court in this series of grain cases, that under the circumstances existing at the time this grain was received for carriage, and the military control over the road exercised at the time, as shown by the military orders in evidence, the railroad company was not at the time a common carrier of forage to Cairo, and did not become such common carrier unless it voluntarily assumed that responsibility. The evidence discloses the fact that before the grain in controversy was accepted for carriage, the railroad company had for some time refused to receive any more corn for carriage to Cairo, for the reason that it could not get rid of what it already had loaded for that point, because of the tardiness of the government in receiving and unloading the accepted grain, and the refusal of every one else to receive the rejected grain. And in order to induce the railroad company to furnish cars for this and other corn, Fallis, who was the agent for all parties concerned in this matter, well knowing all the facts, in the latter part of March went to Chicago, and saw Mr. Arthur, the general superintendent of appellant's road, and tried to procure cars for this corn. Arthur refused to furnish them for the reason above given. Fallis, to induce Arthur to furnish the cars, told him that he, Fallis, had been to Cairo, and had seen the quartermaster there, and arranged with him that all corn loaded up to the 10th of April, should be promptly unloaded on arrival, and assured Arthur if cars were furnished for this corn, this should be done."

It is undoubtedly correct, as stated, that the Supreme Court has repeatedly decided that appellant's road was so far under the military control of the government of the United States at the time this grain was shipped, that it was not liable as a common carrier unless it voluntarily assumed that

responsibility. But it is also the doctrine of that court, first announced in the case of I. C. R. R. Co. v. McClellan, 54 Ill. 58, reiterated in the case of I. C. R. R. Co. v. Ashmead, 58 Ill. 487, reviewed and adhered to in I. C. R. R. Co. v. Cobb, Christy & Co. *supra*, and again approved as the settled doctrine of the court in Phelps v. I. C. R. R. Co. 94 Ill. 548, that if the company thought proper, notwithstanding the military control of its road, to receive freight and issue its bills of lading for the same without containing any exception as to the governmental control, it thereby voluntarily assumed the duties of a common carrier of goods for hire and would be subject to the liability attaching to that function. Here the corn was accepted by the company and a bill of lading delivered to the shipper therefor, containing no exception to liability on account of governmental control nor on account of any agreement by the shipper, or any one for him, to unload the corn on its arrival at Cairo. Under these circumstances if the verbal contract or representations of Fallis can be available as a defense, it is important to ascertain by reference to the evidence just what contract was entered into or representations made. Mr. Fallis in his testimony says that he saw Mr. Arthur, the general superintendent of the road, the latter part of March at Chicago, and applied to him for cars. Arthur told him he did not want to furnish the cars because the track was already full of loaded cars, and he could not get them unloaded. Fallis then told him he had been to Cairo, and had seen Christy and Hughitt, and that an arrangement had been made between them and the government quartermaster that all corn loaded up to April the 10th would be received. That Cobb, Christy & Co. had agreed to receive it at contract price and Mr. Arthur agreed to furnish the cars and let them be loaded. Fallis further says, "I told him that the quartermaster promised that it should be promptly unloaded, and I was satisfied it would be done. I told Arthur all the conversations with the quartermaster, that he was unloading all the cars of good corn they received." It is not shown that the statements of Fallis were false, nor that he did not correctly tell Mr. Arthur just what had been told him at Cairo. It is

true that the government did, within a day or two afterward, on April 1st, issue an order giving notice that it would receive no more grain after April 10th; but how was Fallis responsible for this? He held no official position, and could not control the actions of the government officials; besides, he did not undertake to be responsible for the fulfillment of the promises of the quartermaster made to him, and whether they would be kept or not was a question of which Mr. Arthur could judge for himself just as well as could Fallis. We see none of the elements of a contract, or false and fraudulent representations in the conversations as detailed by the witness, Fallis, which can affect the rights of appellee, to insist upon the terms of the contract sued on. The version of Mr. Arthur as to what transpired between himself and Fallis, is somewhat different from that stated by Fallis. He says, in substance, Fallis applied to him in the latter part of March or early in April for cars, and upon his promise to unload promptly at Cairo, he, Arthur, furnished the cars. Fallis said that he would unload them if Arthur would furnish them; that they agreed to take the corn and he would see that the cars were unloaded promptly. Arthur told them, Fallis and McClellan, the road was blocked up at Cairo; that it would require some time to get there, and that they must be there promptly to unload. Fallis told Arthur he had orders for shipment from the quartermaster. Mr. Forsythe, division superintendent, says, "Mr. Fallis procured me to load corn early in April, 1865, consigned to Cobb, Blaisdell & Co. He said it should be promptly unloaded upon its arrival at Cairo." Mr. Jacobs, also division superintendent, says, "saw Fallis in March; he wanted cars. I told him there was no object in furnishing cars when there were so many already loaded for Cairo. My impression and belief is, he said they would be promptly unloaded, from the 1st to the 10th of April."

From this evidence, when considered in the light of other well-established facts in the case, it could not have been the intention of Fallis to contract to unload any cars except those containing grain purchased or shipped by him, or in which he was interested in some way. At the time the contract is

alleged to have been made, there were standing on the side-tracks of the road, to be forwarded, from 600 to 1,000 cars loaded with grain and hay for the use of the army. All this freight had to be inspected by a government inspector at Cairo before it could be unloaded, and there was great delay in the inspection. The side-tracks at Cairo would hold but 200 or 250 cars, and they were full of loaded cars. Mr. Arthur says that from January to July in 1865, all freight, every shipment, was under the direction of Gen. Allen; none could be shipped except by his order or that of his subordinates, and in this he is corroborated by the other officers of the road. The government had frequently been applied to by the officers of the road to allow them to unload the cars, but this privilege was refused. It would permit none but its own officers to unload grain which passed inspection, and that which did not, was turned over to the owners or consignees to be unloaded. In the spring of 1865 there were more loaded cars on the track than at any previous time; the government was unloading only forty to ninety per day, while the employes of the road could have unloaded 250 cars per day, had they been permitted by the government officials to do so. About the 1st of April the government had more corn at Cairo than it wanted, and the road, under the direction of the quartermaster, forwarded hay in preference to corn, and very little corn was delivered after that for the government.

At the time the alleged contract was made with Fallis the officers of the company knew all these facts, and were fully advised of the condition of their road. They knew that their side-tracks for hundreds of miles were full of loaded cars which they had been unable to send forward because they could not unload at Cairo. And in view of the condition of things known by the officers of the road to exist, it is remarkable that they should have relied upon the promise of Fallis to do what they had so long been unable to do, or even to get permission to do.

But, admit that this promise was made and relied upon as a contract by appellants, was the injury complained of caused by its non-performance by Fallis? It was, according to its

terms, as stated by the officers of the road, that if cars were furnished they should be promptly unloaded on their arrival at Cairo. The car of corn recovered for in this case, No. 1444, was shipped from Minonk, March 30, 1865. If delivered in a reasonable time it should have reached Cairo within two days; it did not reach there until May 27th, over fifty days from the time it was received by the road, when it arrived badly damaged. The evidence also shows that corn in the sack in a close car will heat and spoil in ten days or two weeks at that season of the year. The number of cars shipped by Fallis were very few compared with the whole number on the road, and we fail to see from this record that the failure of Fallis to unload cars of corn at Cairo, shipped under this contract within two, or even ten days after the 30th of March, materially contributed to the delays in delivering the corn.

The first shipment, on March 30th, was of two cars, one of which reached Cairo April 1st, and was inspected and unloaded by the government on the 4th. The other, the one in controversy in this suit, was shipped on the same day, reached Cairo forty-nine days later, and was delivered to Smith, Boffinger & Co. nine days thereafter. The next shipment by Fallis under the contract was on April 7th, which did not arrive at Cairo until April 15th. So it appears that within the next sixteen days after the corn in controversy was shipped, but one car which Fallis had agreed to unload was delivered at Cairo, and no complaint is made of any delay in unloading that.

We are also of the opinion that the written contract sued on can not be altered or changed by any previous verbal agreement of the parties not incorporated into it. Except in the recital or the acknowledgment of the goods and of their quantity and the condition when received, bills of lading are strictly written contracts between the parties, and come within the general rule which prohibits the introduction of parol evidence to contradict or vary written contracts. Hutchinson on Carriers, Sec. 126; Clark v. Barnwell, 12 How. 272.

Here the written contract executed by the authorized agent of the road required the corn to be delivered within a reasonable time. In this regard the contract was unconditional,

Ill. Cent. R. R. Co. v. Schwartz.

and it must be presumed that it is the contract of the parties as finally agreed upon. To permit a carrier to modify the written contract of affreightment by adding an important condition not named in it, would be to violate a well-established rule of evidence, that a contract reduced to writing and signed by the party to be charged by it, can not rest partly in writing and partly in parol. 1 Greenleaf on Evidence, Sec. 275; M. Ins. Co. v. Morrison, 62 Ill. 242; Bayard v. Malcolm, 1 Johnson, 467.

It is next insisted that this question was settled by the Supreme Court in Cobb, Christy & Co. v. I. C. R. R. Co. 88 Ill. 390. We do not think so. That case was disposed of on other grounds, and we do not regard what is there said on this point as necessary to the decision of the case. It was an expression of opinion as to the weight of evidence on the facts then before the court in an action founded in tort. We are considering the same question in an action on a contract between other parties, and we do not see how what was there said can be an adjudication binding upon the court in this case.

It is also contended by appellant that it was relieved from its obligation to deliver the corn in what would ordinarily be a reasonable time, because of the extraordinary state of circumstances then existing. We have held that the law making the carrier the insurer for the safe delivery of the goods against everything except the act of God or the public enemy, does not apply to the mere time of delivery; and that when extraordinary circumstances arise after the shipment, and which were unforeseen at the time, they may be considered in determining whether the goods were delivered within a reasonable time. I. & St. L. R. R. Co. v. Juntgen, 10 Bradwell, 295.

But that doctrine does not apply to this case. Here all the facts were as fully known to the carrier at the time it assumed the responsibility as they were afterward. The officers of the road, when they received the corn and contracted to deliver it within a reasonable time, knew that there was on the side-tracks an accumulation of from 600 to 1,000 cars which could not be forwarded because of the delay of the government in

inspecting the grain and unloading that which was accepted, and the delay of the owners and consignees to promptly unload that which was rejected. They also knew that shelled grain in the sack in a close box car would heat and spoil at that season of the year within ten days or two weeks. They knew, too, that the road was liable to constant interference by the government. In view of all these facts the company received the grain and contracted to deliver it within a reasonable time without any conditions to cover such contingencies, and by this contract the rights of the parties must be determined.

It is further contended by appellant's counsel that the corn was perishable property, and that it was injured solely by its inherent tendency to decay, and that appellant is therefore protected from liability by a clause in the bill of lading sued on, to the effect that appellant should not be liable for damages to perishable goods. It is undoubtedly true, as shown by the evidence, that the corn would perish from its own tendency to decay, when shipped in the manner described, if kept in close cars long enough; but it is equally certain from the evidence that it would not have been damaged from this cause had it been delivered within a reasonable time.

This objection was considered and passed upon adversely to appellant in McClellan v. I. C. R. R. Co. *supra*.

Other reasons are urged for the reversal of this judgment, but in view of what has been already said, we do not deem it necessary to notice them here. We fully agree with what was said by Chief Justice Lawrence in the opinion of the court in I. C. R. R. Co. v. Cobb, Christy & Co. *supra*. It was there said, "The officers of the company knew, or must be taken to have known, the condition of their road, and they were the only persons who did know it in its full extent. As soon as this blockade began along the road, it was not only the right of the company, but its plain duty to refuse to receive more corn for shipment until its line was clear. On no principle of law can it be excused for accepting corn which it knew at the time it could not properly transport. The more imminent the peril to the freight, the greater was the obligation of the

carrier to refuse it, except upon a special contract. To permit the carrier, without a special contract, to escape liability for great delay on the ground that it was unavoidable, when the causes likely to produce it were known to him at the time of the shipment, and the result of his own negligence, would violate the principles lying at the foundation of the law of common carriers. Even if the risk is known to both parties, the carrier voluntarily assumes it when he accepts the shipment without condition."

For the reasons here given we are of opinion that the judgment of the court below should be affirmed.

Judgment affirmed.