Caton, J. The main question in this case, requires us to determine the character and extent of the liabilities of ferrymen. We find the law too well settled to admit of doubt or dispute, that they arc common carriers, as to all property which they transport in tlicir boats, whether accompanied with passengers or not. This is the law as laid down by all of the elementary writers, whom we find treating on the subject, as well as the adjudged cases, and to this rule, we have not met with a single exception. We may refer to Jones on Bailment, 10G; Story on Bailment, 828 ; 2 Kent’s Com., 589, and we find it stated, in 2 U. S. Dig., 424, §25, that it was held in Cohen v. Hume, 1 McCord, 439, that “ as soon as a carriage is fairly on the drop or slip of a flat, though it be driven by the owner’s servant, it is in the ferryman’s possession, and he is liable for any subsequent damage that happens to it or the horses.” We regret that we have not access in this Division, to the report of this case, but at any rate, we have enough to show that the law, as applicable to common carriers, is applied to ferrymen in North Carolina. As such seems to be the well settled doctrine in England, and as we know of no State where a different rule has prevailed, we feel bound to consider the principle not now open to controversy; and certainly there is as much reason in holding the carrier, who transports travelers and their property across responsible, as him who conveys them up and down the river. Indeed, if there is any difference, there is more propriety in applying the strict rule to the former, than to the latter, for he enjoys a franchise,'—a special privilege, which is granted to him. in consequence of his superior qualifications to fill a public trust, of great responsibility, while the latter enjoys no special privilege, but is engaged in a business open to all. A distinction was attempted to be drawn upon the argument, between ferrymen and other common carriers, because it was said they are not ordinary carriers of merchandise, but of the pfiblie travel, where the owner is usually along with his property. Upon the same principle, all packet boats, whose chief business it is to carry passengers and their baggage, should be exempted from the strict responsibility of common carriers. But no such distinction is any where recognized in the books, that we are aware of, and pr’obably because there is no reason for it. We are clearly of opinion then, that the defendant’s liability was properly held by the Circuit Court to be that of a common carrier. This liability is very strict. They are held liable for all damage to goods intrusted to their care, unless the loss is occasioned by inevitable accident, not brought about by human agency, the public enemy, or the owner of the goods. It makes no difference whether the carrier has done all in his power to prevent the loss or not; his responsibility is still the same. He is the absolute insurer of the property against all losses, except those occasioned by the causes above specified. Forward v. Pillard, 1 T. R., 33; Hyde v. Navigation Co., 5 T. R., 389. As he is supposed to be better qualified, than even the owner himself, to take care of the property while in transitu, he has the absolute control over it, and can make such disposition of it as he sees proper, and he must see to it that he carries it safely. Such is the authority and such the liability of a ferryman as to property which he transports. He may determine when it is safe and proper to go,—the number of teams which he can safely carry, and may assign to each its order and proper position, and when once received on board his boat, all are in his possession and under his control, and he has the right to make such disposition of them as prudence may dictate, and their safety require. His dominion over them is as complete as over Ms own property. He may even have the right, in case of peril, to command the services of his passengers. It is true, he may be liable for a wrongful exercise, or an abuse of his powers, as if he should refuse to go when he could safely do so, or should refuse to take a traveler when he could with propriety. It is true, that travelers usually have a care, and to a certain extent take charge of their own teams and property while on the ferry boat, but this is in subordination to the ferryman himself. If they do not manage or dispose of them as he thinks best, he may take them entirely out of their hands and arrange them according to the dictates of his own judgment, for he is responsible for their safety. It is true, if the owner, by his wilful and perverse conduct, occasions a loss which would not otherwise have happened, then he cannot charge the ferryman with a loss, for which he alone is responsible. But while acting in good faith, and not in violation of the ferryman’s commands, the owner may be considered as his servant so far as he does manage the property, after it has once got into the boat, and thus come into the possession of the boatman. A distinction has been drawn between the transportation of slaves, and that of other property, but this was on account of their intelligence as human beings. We were asked to extend the same rule to other animals when transported. But the same reasons do not apply. The former partake of the character of passengers, while the latter are purely freight. There may be a reason, in one respect, for drawing a distinction between animals and inanimate freight, and that is where the animal is of such a disposition, that he cannot be safely transported in a boat, and where no prudent man would intrust him in such a conveyance. In such a case, should the animal ■be lost on consequence of such disposition, when every precaution had been taken in the construction and management of the boat, and in the arrangement of the freight, I should be inclined to held, that the loss might be attributed to the misconduct of the owner, in improperly putting such an animal on board a beat. But there is no pretence that this horse was of such a disposition. There were no guard chains or bars across the ends of the boat, and the testimony shows, what every man’s own judgment would dictate, that the boat would have been much safer, had it been thus provided. Had this reasonable precaution been taken, in all human probability, this accident would never have happened. Indeed, it is matter of surprise, that all ferry boats are not provided with such safeguards, and it is equally surprising, that more accidents do not occur for the want of them. If ferrymen were more generally aware of the nature and extent of their liabilities, it is most likely that ferry boats would more commonly be provided with bars or chains, at the ends, to protect teams from getting into the river. The instructions given to the jury, held the defendant liable as a common carrier, and without reviewing them particularly, we are satisfied that the law was properly laid down by the Court. During the trial, evidence was given by the defendant, tending to show, that Kuhn, who was driving the plaintiff’s horse at the time, and who at the request of one of the ferrymen, was holding the horse by the head, was requested by those having charge of the boat, to unhitch the horse from the carriage, to which he made no reply, and did not do so. Kuhn swears he has no recollection of having heard any such direction, and one of the ferrymen says he thinks he must have heard it, although he says there was a strong wind blowing at the.time, and that Kuhn was to the windward of the person giving the direction. This testimony, the jury were instructed to disregard, and in this we think there was no error. Even if Ku.hu had heard the direction, he was not bound to obey it. The horse and carriage were in the possession and control of the ferrymen, and Kuhn was under no more legal obligation to unhitch the horse, than he was to assist in propelling the boat. It was strictly the business of the ferrymen, to do all that was needful for the safe transportation of the property intrusted to their care. This evidence did not tend to show that Kuhn did anything improper, which contributed in any degree to bring about the accident, but only that he omitted to do that which he 'was not bound to do¡. .even if he had heard the direction. We think the defendant cannot complain of the qualification to the sixth instruction. Kuhn was holding the horse at the request of the ferrymen, and in doing this, he was acting as his agent, and while he acted in good faith and to the best of his abilities, the latter was responsible for the ultimate consequences. The sixth instruction, as qualified and given, laid down a rule even more favorable for the defendant than this, for the Court held, that if Kuhn so held the horse or pulled the reins, as to cause the horse to get off of the boat, and ff he would not have backed off, if Kuhn had not touched him, they should find for the defendant. This at the very most, was all that the defendant could ask. Certainly he ought not to claim any advantage, because Kuhn, obeyed in good faith the directions given him to hold the horse, more than he would have done, had the man disobeyed him, especially when the result, as the qualification supposes, was not changed by what he did. In the first place, the defendant seeks to avoid responsibility, because Kuhn did not obey orders, which most likely he never heard, to unhitch the horse, and next because he did obey orders, to hold-, the horse. It is more than likely, that if Kuhn had heard and obeyed the order to disengage the horse from the carriage, the same accident would have happened, while he was thus engaged, and then with the same propriety the defendant might have urged, that Kuhn did not proceed with sufficient presence of' mind or dispatch; or if he had not left the horse’s head, he w-'ould not have backed off the boat. We are well satisfied, that, if either party failed to do that which it was his duty to do, if: was the ferrymen, and not Kuhn, but if the former did all they could and were guilty of no negligence whatever, still as a common carrier, the defendant is just as liable in point of law, as if “ there had been negligence. The judgment of the Circuit Court must be affirmed. Judgment affirmed. Trumbull, J., dissented.