S. SAMUELS & CO. v. TEXAS & N. O. R.
CO. et al.

(Court of Civil Appeals of Texas. Galveston.
June 13, 1912. Rehearing Denied
Oct. 10, 1912.)

EVIDENCE (§ 131*)—PROOF OF SIMILAR TRANS-
ACTIONS—ADMISSIBILITY.

In an action against carriers for loss of
cotton bales which burned in transit, wherein
defendants claimed that fire was concealed in
the cotton when it was shipped, it was error to
permit a witness to testify for defendants con-
cerning the breaking out of fire in other cotton
loaded on a barge where the two shipments
were not made under the same conditions.

[Ed. Note.—For other cases, see Evidence,
Cent. Dig. §§ 399–402; Dec. Dig. § 131.*]

Error to Harris County Court; A. E. Am-
erman, Judge.

Action by S. Samuels & Co. against the
Texas & New Orleans Railroad Company
and another. Judgment for defendants, and
plaintiffs bring error. Reversed and re-
manded.

B. F. Louis, of Houston, for plaintiffs in
error. Baker, Botts, Parker & Garwood
and Lane, Wolters & Storey, all of Houston,
for defendants in error.

PLEASANTS, C. J. This suit was
brought by plaintiffs in error, a firm com-
posed of S. Samuels and H. Samuels, against
the defendants in error, Texas & New Ór-
leans Railroad Company and Morgan's Lou-
isiana & Texas Railroad & Steamship Com-
pany, to recover for injury and damage to
a car load of cotton, consisting of 44 bales,
which was delivered by plaintiff to defend-
ants at New Orleans, La., for shipment to
Houston, Tex.

It is alleged that the cotton was de-
livered to the defendants on December 31,
1908, and delivered by the defendants to
plaintiffs at Houston on February 9, 1909, in
a badly damaged and burnt condition, and
that the difference in the value between the
condition when delivered to the railroad
companies at New Orleans, and received by
the plaintiffs at Houston, Tex., amounted to
the sum of $840.27. The defendants an-
swered by general demurrer and general de-
nial, and specially pleaded that the cotton
was on fire at the time it was delivered to
them at New Orleans, and that it was partly
ly consumed en route by the breaking out of
fire therein, which, without the knowledge
of defendants, was concealed in said cotton
at the time it was received by them for ship-
ment. They further pleaded that the cot-
ton was transported in a car that was
tightly closed, and said cotton was not ex-
posed to fire while en route and its damage
was not caused by any negligence on de-
fendants' part, but was due wholly to the
fact that fire was concealed therein when it
was delivered to and received by defend-
ants. The trial in the court below with a
jury resulted in a verdict and judgment in
favor of defendants.

The evidence shows that the cotton in
question was a part of a cargo which was
discovered to be on fire in the steamship
Alexandria at New Orleans, and was unload-
ed from said ship on December 18, 1908.
After the 44 bales in question had been tak-
en from the ship they were saturated with
water and were under close supervision for
10 days, when they were sold to plaintiffs.
After plaintiffs purchased them, they were
kept under careful watch until December
31st, when they were delivered to defendants
for shipment to Houston. There had been
no indication of any fire in the cotton for
10 days or more before it was delivered to
defendants for shipment.

Mr. H. Samuels testified that the 44 bales
in question were the best of the lot, pur-
chased by him, of 76 bales, and was almost
as good as any cotton except that he would
have to pick off 15 or 20 pounds, or at the
utmost 25 pounds, per bale; that there was
not any fire in the cotton at the time he
purchased it, and that the fire had been out
seven or eight days; that he purchased the
76 bales of cotton two or three days be-
fore it was shipped, and that the badly burnt
cotton was placed in a different car from
that in question, and it arrived safely; that
he had a great deal of experience with fire
burnt cotton for about 20 years; and that,
if the bale of cotton is good and bands are
on it, you can easily tell if there is any fire
in it, and that every one of the 44 bales in
question had the bands on them.

A. D. Selph, witness for defendant, who
was present when the cotton was unloaded
from the steamship, and who saw it three
or four times a day, and supervised the
sealing of the car, testified that the cotton
was saturated with water on the levee at
New Orleans from the 19th to the 30th; that
he saw the car in which this cotton was
loaded about 20 minutes after it was loaded;
that the car was sealed, under his supervi-
sion, and he had a man reopen the doors
and count the bales, and reseal the car; that
he saw every bale of cotton in the car, "and
there was nothing to indicate that there
was any fire when I examined the car.
There was no odor of burning cotton. That
cotton was not on fire when I saw it." Aft-
er being loaded, the car remained at New
Orleans, or just across the river at Algiers,
until January 2d, when it started on its
journey. Just before the train in which it
was being carried reached Orange, Tex., on
January 3d, the car of cotton was discov-
ered on fire, and, when the train reached
Orange, it was thrown out, and the fire ex-
tinguished after it had damaged the cot-
ton to a considerable extent.

The defendants showed by the testimony of several of its employés who handled the train in which the cotton was carried that it was transported in a tightly closed car which was sealed during the whole time of transportation, and that there was no negligent handling of the car in any way on the journey from Algiers to Orange. The defendants, over the objection of the plaintiffs, were permitted to introduce the following testimony of the witness W. H. Guess: "I live at Houston Heights. I am assistant superintendent of the Direct Navigation Company. I held the same position in 1909. This company handles freight from Galveston to Houston. I handled four barges of cotton from Galveston in the month of February, 1909. That fire occurred on the night of the 22d of January. The cotton was stored in the docks at Galveston. They did all that was possible to put out that fire, and dumped some of it into the bay. I think we handled all of the cotton that was bought by one firm. One firm bought some cotton that we did not handle, but all of the other that was brought to Houston we handled. We loaded the first barge on the 2d of February. We loaded the second barge on the 4th of February, and the next on the 5th, and the next on the 10th. The fire occurred on the 22d of January. When we loaded this cotton, there was not any fire we could detect. It was all put out. We were requested by the shippers to put extra force in, usually we used one barge man, and on this occasion we put on two men, and the cotton was not covered up. Yes; the barges were loaded the 2d, 4th, 5th, and 10th of February. Yes; those were the days it was shipped out to Galveston. The barges left Galveston in the evening, and got here the next morning. The next morning they sent me word the barge was on fire, and I sent a towboat down. The cotton was stored on the barges not over three bales high on the flat. Some were in good shape, and some had a great deal of loose cotton." On cross-examination, he stated: "No; I did not keep any record of the number of bales involved in that Galveston fire. In fact, the cotton was in such condition that we could not keep a record. I could not say positively how many bales were on fire in Galveston. I don't think we kept any record of the number of bales or pieces of bales the Direct Navigation Company brought up from Galveston. We had four barges. A barge could carry 1,000 bales. No; we did not have that many, or I don't think we had over 300 bales to any one barge. Yes; a great many bales had been so burnt that they did not amount to a bale. We got out of that about 1,200 bales, some of these pieces probably represented several bales. I don't know if there were 3,200 bales on fire or not. The fire broke out in Galves-

ton on the 22d day of January. No; I don't know what efforts were made to put out the fire. No; I was not there. I was there the first day the cotton was sold, that was two or three days before it was loaded on the barge. Yes; that was two or three days before the 2d of February. No; I don't know what was done to put out the fire. The fire department was working on it all the time. I came out of Galveston that night. Yes; I left Galveston on January 30th. Yes; we were through with it, the sale of the cotton. Yes; that was two or three days before the first barge was loaded. I could not say the exact date that I next saw the cotton. I think it was when the third barge was loaded on the 5th. Yes; I went down on the morning of the 5th. No; I don't know what efforts were made to put out the fire between the 30th and the 5th. When I went down on the 5th, they had a hose and a watchman on the docks. Yes; they were putting water on the cotton. No; not all of it. There was some loose cotton that was on fire all the time. No; I did not stay all day. I came on back to Houston. No; I was not there when the barge left. No; I don't know of my own knowledge that the barge was discovered on fire coming up the ship channel. No; I don't know of my own knowledge what effort was made in Galveston to put out the fire. I saw them put water on it, and I don't know if it was the cotton they put on the barges that I saw them put in the water. No; I never had any experience with burnt cotton before that. The handling of that cotton was under my foreman. Yes; I saw the barges, and I saw a barge afire at the foot of Travis street, but I don't know which barge. Yes; that was after it got to Houston. We had one extra man on each barge. No; we were not paid extra for that. Yes; I knew we had an extrahazardous load. No; we were not told that the fire was not out, but that we must be prepared for emergencies. No; we were not told that the fire was still burning, but it is possible that it was. They said it was possible that fire might break out. We were using oil for fuel. The barge men were white men. It is against the rules for them to smoke. I don't know the day, but I know one of the barges was on fire at the foot of Travis street. No; I don't know how it originated. Yes; that is all the experience I have had with burnt cotton. Yes; my foreman had direct charge of the barges. No; he is not here. He is in Galveston. The barges are in Galveston. Yes; I saw this barge on fire at the foot of Travis street. I could not say which one, but it was one of the barges loaded at Galveston."

Plaintiffs objected to this testimony, and moved that it be stricken out on the following grounds: "That it appeared from the

said witness' own testimony that he had no knowledge of the facts as to the efforts made to put out the fire in the cotton about which he was testifying; that of his own knowledge he did not know what cotton was loaded on the barges about which he testified; that of his own knowledge he did not know how the fire originated in the barge which he afterwards discovered on fire in Houston; that all of his testimony was hearsay; that it related to an entirely separate transaction not connected with the matters in suit; and that all of such testimony was immaterial and irrelevant, and tended to prejudice the plaintiffs' case before the jury." We think the court erred in admitting this testimony, and plaintiffs' assignment of error complaining of its admission must be sustained. The only evidence tending to contradict the testimony of plaintiff H. Samuels and that of defendant's agent who received the cotton at New Orleans that there was no fire in the cotton when it was loaded into defendant's cars and received by them for shipment was the testimony of the operatives of the train in which the cotton was transported from New Orleans to Orange, tending to show that fire could not have been communicated to the cotton after it was placed in the car and the car closed and sealed. In this state of the evidence any testimony tending to show that notwithstanding the treatment this cotton had received in order to extinguish the fire which got into it on December 18, 1908, such fire might have remained in the cotton undiscovered during all the time which elapsed from December 18, 1908, to January 3, 1909, when it was found to be on fire. The fact that fire might be concealed in cotton for this length of time under the conditions shown to have existed in regard to this cotton might have been shown by the testimony of any person having experience and knowledge which would enable him to testify to such fact, and evidence of particular instances in which fire had so remained undiscovered in cotton for this length of time would be admissible, provided the efforts made to extinguish the fire were the same, and the opportunity of its earlier discovery and the improbability of other means by which it might have been communicated were the same as in the present case. We think the testimony of the witness Guess detailing the circumstances of the breaking out of fire in cotton on a barge operated by his company between Houston and Galveston in January or February, 1909, falls short of meeting the test of admissibility above stated. The cotton was not shown to have been shipped under the same conditions and its condition and appearance at the time it was loaded is not shown to have been the same, nor is it shown that it was kept under immediate supervision before shipment and constantly saturated with water as was the cotton involved in this suit. In addition to this, it was not shown with any degree of certainty that fire was not communicated to this cotton while en route from Houston to Galveston. There can be no question of the injurious effect upon appellants' case of the introduction of this testimony, and the error of the court in permitting it to go to the jury requires a reversal of the judgment, and it is accordingly so ordered.

Reversed and remanded.