## K. Arakelian et al., trading as Arakelian Brothers & Company, Plaintiffs in Error, v. Southern Pacific Company, Defendant in Error.

### Gen. No. 25,341.

1. COMMERCE, § 5*—*what governs interstate shipments.* Where shipments are interstate, the contract of shipment, federal legislation on interstate commerce, together with decisions of the federal courts construing the same, must control in the decision of all questions involved.

2. CARRIERS, § 69*—*what is liability of carrier of goods.* Under the federal law a common carrier is an absolute insurer of the safety of goods transported except, loss resulting from the act of God, the act of the public enemy, authority of law, the fault of the shipper, or the inherent nature or vice of the article shipped.

3. CARRIERS, § 137*—*when shipper has burden of showing loss due to carrier.* While the question of diligence on the part of a carrier in an action for injury to goods shipped is ordinarily wholly immaterial, yet, where the condition of the goods as delivered is shown by the evidence to be such as to indicate prima facie that the injury was the result of one of the excepted causes, exempting the carrier, the burden is cast upon the shipper to show that the damage resulted from the negligence of the carrier.

4. CARRIERS, § 138*—*what evidence is admissible on issue of injury to goods.* Where the evidence showed that the damage to a shipment of cantaloupes was caused by ripeness, softness and moldiness, evidence on the part of the carrier as to its due care was admissible as tending to show that the deterioration in the fruit was not caused by any matter or thing which could have been prevented by it.

5. CARRIERS, § 138*—*when evidence of refrigeration tests is inadmissible to show injury to goods.* In an action against a carrier for injury to a shipment of cantaloupes, evidence of certain refrigeration tests, made in connection with shipments of cantaloupes other than those in suit, is inadmissible without first showing a similarity of the shipments in all essential particulars.

BARNES, P. J., dissenting to modified opinion.

Error to the Superior Court of Cook county; the Hon. OSCAR HEBEL, Judge, presiding. Heard in the Branch Appellate Court at the October term, 1919. Reversed and remanded. Opinion filed

*See Illinois Notes Digest. Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

November 30, 1920.   Rehearing denied and opinion modified and refiled December 17, 1920.

CHARLES A. BUTLER, for plaintiffs in error.

JOHN A. SHEEAN, for defendant in error.

MR. JUSTICE MATCHETT delivered the opinion of the court.

Plaintiffs in this case went to trial before a jury upon issues raised under a declaration which alleged that the defendant was a common carrier, and that at certain points in California the plaintiffs had delivered to it certain property described as raisins and cantaloupes, to be carried and delivered by the defendant at points named without the State; that the defendant promised plaintiffs to safely and securely carry the same, but that it defaulted in said promise and delivered the property in a damaged condition.

To this declaration defendant filed the general issue with notice that it would rely upon the provisions of the bills of lading under which the property was shipped, and that the shipments were interstate in character and covered by federal laws.

The plaintiffs also filed a bill of particulars, stating the number of the cars used in shipment, with dates of shipment, points of origin and destination, with the amount of damages claimed as to each shipment.

Upon the trial the plaintiffs offered evidence tending to show that the cantaloupes and raisins were delivered at the respective points of origin in good marketable condition, and the same were received at the respective destinations in a damaged condition. Evidence was also offered as to the amount of damages sustained, and as to each shipment. These were computed on the difference in the market value of the fruit at the time and in the condition it was when delivered to the defendant for transit, and the market value thereof at the time and in the condition when

delivered at respective destinations, plus the charges paid for transportation. The bills of lading were also offered in evidence. These acknowledged the receipt of the goods "in apparent good order except as noted (contents and conditions of contents of packages unknown)," that the service to be performed should be subject to all the conditions mentioned in the bills of lading, whether printed or written therein or thereon. By these it was provided that no carrier should be liable for any loss or damage or delay "caused by the act of God, the public enemy, quarantine, the authority of law, or the act or default of the shipper or owner, and that, except in the case of the negligence of the carrier or party in possession (and the burden to prove freedom from such negligence should be on the carrier or party in possession), such party should not be liable for loss, damage or delay occurring while the property was stopped and held in transit upon request of the shipper or owner" "or resulting from defect or vice in the property."

Upon these bills of lading under which the cantaloupes were shipped appear directions in writing to "keep fully iced to destination." The defendant offered evidence tending to show the exercise of due care on its part to prevent injury to the fruit, from the time of receiving of the same until the delivery thereof. This evidence tended to show that cantaloupes were of a perishable nature; that after being removed from the vine and reaching a certain stage of maturity, they have a tendency to deteriorate, and that this deterioration may best be prevented by refrigerator cars, which are thoroughly insulated and constructed in such a manner as to give proper protection to property of this kind against dangers from the weather. The distance traversed by the cars was proved, the lines over which they passed, and a complete record was furnished of the equipment, and the "in and out" time at important stations on the route, with complete

United States Government temperature records, covering the 24-hour period of each day any car was at any particular point.

The defendant also offered and the court received and allowed to go to the jury certain tests made in connection with other shipments of cantaloupes from California to eastern destinations, which will be discussed more fully later in this opinion.

All of this testimony was objected to by the plaintiffs at the time it was offered, and at the close of the case the plaintiffs moved the court to exclude the entire evidence of the defendant and asked that an instruction to the jury be given to find a verdict for the plaintiffs. These motions were denied and the cause was submitted to the jury under instructions which we must presume were correct since the same are not abstracted. The jury brought in a verdict for defendant upon which the court entered judgment, from which this appeal is taken.

The principal errors assigned and argued are that the court admitted improper evidence offered in behalf of the defendant, and in refusing to strike such evidence out, and in refusing to direct a verdict for the plaintiffs.

It is, of course, conceded by all the parties that since the shipments were interstate, the contract of shipment, federal legislation on interstate commerce, together with decisions of the federal courts construing the same, must control in the decision of all questions involved. The federal law has superseded all local or State law on this subject. *Adams Exp. Co. v. Croninger*, 226 U. S. 491; *Gamble-Robinson Commission Co. v. Union Pac. R. Co.*, 262 Ill. 400. Under this federal law we think it must further be held that a common carrier is an absolute insurer of the safety of the goods transported except, first, loss resulting from the act of God; second, loss resulting from the act of the public enemy; third, loss resulting from

authority of law; fourth, loss resulting from the fault of the shipper; fifth, loss resulting from the inherent nature or vice of the article shipped. 1 Hutchinson on Carriers (3rd Ed.), sec. 265; *Adams Exp. Co. v. Croninger, supra; Cincinnati, N. O. & T. P. Ry. Co. v. Rankin*, 241 U. S. 319.

Appellants contend that since it appeared in this case that the fruit was received in good condition and was delivered in a damaged condition, the burden was thereby cast on the defendant carrier to show, if it could, that the cause of loss was within one of the excepted causes, and that until such fact was made to appear, the question of diligence or ordinary care by the carrier in transit was wholly immaterial, and in this connection, with other authorities we are cited to Hutchinson on Carriers (3rd Ed.), vol. 1, sec. 4, where it is said: "* * * But the question of negligence, when the purely common-law relation of common carrier to the goods exists, is ordinarily wholly foreign to the inquiry whether such a carrier is to be held liable for their loss or injury, and, as will hereafter be seen, evidence on his part of the most exact diligence will be wholly irrelevant and inadmissible. * * *" See also 10 Corpus Juris, page 107; *Fisher v. Clisbee*, 12 Ill. 344; *Cudahy Packing Co. v. Atchison, T. & S. F. Ry. Co.*, 193 Mo. App. 574; *John Lysaght, Ltd. v. Lehigh Val. Ry. Co.*, 254 Fed. 351.

While it may be conceded that this is the general rule, some of the federal decisions also hold that where the condition of the goods as delivered is shown by the evidence to be such as to indicate prima facie that the injury to them is the result of one of the excepted causes, the burden is then cast upon the shipper to show that the damage resulted from the negligence of the carrier. Thus in the case of *The Folmina*, 212 U. S. 354, the court said:

"Of course, where goods are delivered in a damaged condition plainly caused by breakage, rust or decay,

their condition brings them within an exception exempting from that character of loss, as the very fact of the nature of the injury shows the damage to be prima facie within the exception, and hence the burden is upon the shipper to establish that the goods are removed from its operation because of the negligence of the carrier.''

See also the case of *The Patria,* 132 Fed. 971.

This doctrine of the federal court seems also to have been recognized in Illinois. *Illinois Cent. R. Co. v. McClellan,* 54 Ill. 58, as well as other States. *Truax v. Philadelphia, W. & B. Ry. Co.,* 3 Houst. (Del.) 233; *Rixford v. Smith,* 52 N. H. 355.

The undisputed evidence in this case is that the damages to the cantaloupes were on account of ripeness, softness and moldiness, and we think that under these decisions, and under the provisions of the bills of lading, these facts being made to appear, evidence on the part of the defendant as to its due care was admissible as tending to show that the deterioration in the fruit was not caused by any matter or thing which could have been prevented by it. It is to be noted this form of bill of lading provides that the burden of disproving negligence in such case is on the carrier.

A more serious question, however, is raised by the error argued, in that the court admitted the testimony of certain tests made by one Richardson, and others, in connection with the shipment of other cantaloupes from California to eastern destinations. The witness testified to a number of shipments which were made in standard refrigerator cars, which were similar in construction to those used in the instant case; that he made experiments on cars moving in transit to the number of one hundred and forty, carrying cantaloupes, bananas, oranges, lemons, peaches, potatoes and onions, originating at Pacific coast points and destined for Chicago or New York City, covering a period between 1916 and 1918 in different months of the year. That he took temperature readings on these

trips by means of an apparatus consisting of a reading box, incorporating a diary on which temperatures were recorded by means of a wheatstone bridge and battery attached to the reading box, each car being equipped with a main table that ran along the top of the car from the outside through the side door to the inside of the roof, being flattened in going through the door into a flat copper strand about one-eighth of an inch thick. That inside of this main cable were the common and battery wires, and these wires running to as many different connections; that from the main cable inside the car six drop cables were attached, and at the end of each was attached a small cap about the size of one's finger, and pointed on the end, and in this cap or bulb was a small coil of wire made of special alloy, and specially sensitive to temperatures, so that when the current was turned on to the main table, resistance was felt in this coil, being more or less according to the temperature of the coil, and by measuring this resistance, he would get the temperature of the air immediately around it; that these six bulbs were placed in the fruit itself, two next to the bulkhead near the ice, two quarter way of the car and two in the center of the car, one each being in the bottom and upper layers of the load where placed in the car; that usually six readings were taken and sometimes twelve in different parts of the car; sometimes of the air six inches from the top of the load; that the first temperature taken was immediately when the car was completely loaded; when the inside temperatures were taken of the commodity, but also took outside temperatures by placing a certified thermometer in the shade; that inside temperatures were taken from five to seven times a day, three to six hours apart. Notes of these temperatures were taken on a tab form prepared beforehand, and these records showed the towns and States, the hour, day of month and month of year, outside temperatures, and those of six different read-

ings in the car, the parts of the car, the number of the car, commodity and method of loading were recorded on these sheets. The notes were afterwards transferred to graphical test charts three feet by four feet in size, the temperatures represented thereon by curves and lines, exactly reflecting the notes in the information; one side of the chart was graduated into degrees of temperature and the other side into days and hours, one of eight lines therein representing the outside temperature, the second, the average temperature of the commodity in the car en route, and the other six temperatures of the commodity in the six different places in the car en route. These lines were put in different colors to distinguish them, symbols therein indicating what the particular line had reference to. At the top of the chart the icing stations were printed and brown lines representing the amount of ice placed in at each icing station, and other lines showing the meltage of ice en route, and showing also where certain icing stations were passed.

It was stipulated that if R. C. Dearborn, who accompanied Richardson, was called as a witness, he would corroborate him to the effect that Richardson's testimony as to the manner of taking and recording the temperature readings was correct. The original notes of all these shipments were offered in evidence, but the court, on objection by the plaintiffs, excluded notes referring to articles other than cantaloupes, but as to these admitted in evidence twenty of the exhibits. The graphical charts were, however, excluded. Also over objection the witness was allowed to testify as to the condition in which the cantaloupes were found to be by him upon examination at the end of the journey; that in one of the cars he found 8 per cent "soft," 30 per cent "turning," and 60 per cent "solid," the latter meaning firm. Similar testimony was offered and received, over objection, as to the other shipments. As authority for the admission of

this evidence appellee refers us to the discussion in 17 Cyc. 283, with reference to the receiving in evidence of similar occurrences "and experiments." It is there stated:

"That a fact existed or event occurred at a particular time cannot be shown by evidence that another fact existed or event occurred at another time, unless the two facts or occurrences are connected in some special way, indicating a relevancy beyond mere similarity in certain particulars. Such relevancy is found where similarity in all essential particulars is shown to exist. Evidence of other facts or occurrences is then admitted, provided the court deems this course a wise exercise of its administrative discretion. The probative fact or occurrence may be first found in actual life by observation, or, second, reproduced voluntarily in an experiment."

We think, within this statement of the doctrine on which appellee relies, this evidence should not have been admitted for the reason that the foundation for its introduction was not laid by showing a similarity in all essential particulars. We think it is apparent that the condition of the fruit at the time of shipment would be clearly an essential particular, on which evidence of similarity should have first been received. This is wholly lacking in this case, and this omission, we think, clearly renders the evidence offered inadmissible.

Also it is made to appear in the evidence that there are different kinds of cantaloupes, some of which are less subject to deterioration than others. What kind of cantaloupe was shipped in the experiment made by the witness does not appear from the evidence. As is said in 4 Chamberlayne on Evidence, sec. 3174, page 4375:

"While it may be frankly conceded that should a collateral occurrence, involving the uniformity of natural law, be presented, which should be precisely similar in all its circumstances to the principal case, and result in the creation of a particular state or the

happening of a given event, the results of such collateral occurrence would be highly probative, the administrative difficulty experienced by the courts consists in the fact that such precisely similar collateral occasions are seldom encountered in practice.  The rule, therefore, as usually stated, permits the reception of collateral occurrences which are substantially similar in their circumstances, i. e., are similar in all esential particulars.  Where, however, the collateral occasion fails to present some substantial similarity to the one involved in the enquiry, i. e., where important or material variations in the phenomena of the two occasions are presented, proof of what happened on a collateral occasion will be rejected.''

See also *Hawks v. Charlemont,* 110 Mass. 110; *Campbell v. Russell,* 139 Mass. 278; *Emerson v. Lowell Gas Light Co.,* 3 Allen (Mass.) 410; *S. Samuels & Co. v. Texas & N. O. R. Co.* (Tex. Civ. App.), 150 S. W. 291; *Cox v. Steed,* 62 Tex. Civ. App. 193, 131 S. W. 246; *P. & A. R. R. Co. v. Atkinson,* 20 Fla. 450; *Names v. Dwelling House Ins. Co.,* 95 Iowa 642, 64 N. W. 628.

It is admitted by appellee that this evidence probably had considerable effect upon the jury, and its admission being erroneous, irrespective of the other questions involved, the judgment must be reversed and the cause remanded.

*Reversed and remanded.*

BARNES, P. J., and GRIDLEY, J., concur.

---

## MODIFIED OPINION.

MR. JUSTICE MATCHETT delivered the opinion of the court.

The defendant in error has filed a petition for rehearing in which it is said that the court ''has apparently misconceived the condition of the record''; that

the court has assumed that the purpose of the testimony offered and received with reference to the "test cars" was for the purpose of showing that the fruit was not in good condition at the time it was delivered to the carriers at the point of origin, whereas, the purpose of the evidence was "to prove the effect of the refrigeration upon the temperatures inside the test cars and thereby to justify the natural deduction arising from the unvarying effect of the application of the ice in reducing the average temperature of the fruit in these cars to a stage of about forty degrees, that the average temperature of the fruit in the cars in suit was reduced to a like extent and that therefore the defendant was in the exercise of due care in handling the shipments in question so far as the icing feature of the service was concerned."

We are of the opinion, however, that the evidence was not admissible on the facts as the same appear in this record even for that limited purpose; and this for the reason that substantial similarity of all essential particulars was not shown. If the only purpose of the testimony was to show that ice in a refrigerator car has a tendency to reduce temperatures, we think an experiment of this kind would not be necessary to prove that fact. It was necessary as the statement of defendant in error indicates to show that the effect of the icing was to reduce the temperature of the fruit to a certain degree and thus justify the inference of due care. The defendant attempted to show this by proof that the temperatures had been thus reduced in other shipments of the same kind of fruit over similar routes in similar cars where ice was applied in substantially the same manner. In order to make this evidence at all admissible it was necessary under the authorities to show similarity of the shipments in all material and essential matters. Defendant showed the shipment of similar kind of fruit in similar cars over similar routes with the application of ice in a

somewhat similar manner and with outside tempera-
tures somewhat similar. It was found that the inside
temperatures were thus reduced in such manner as
due care might be inferred therefrom as to those partic-
ular shipments. But defendant did not show that the
condition of the fruit before or at the time of the use
of the ice was the same or that the conditions of the
cars remained the same or similar during transit as
in the instant case, or that in other respects the same
degree of care and diligence was used by the carrier.
No sufficient foundation was therefore laid for the
introduction of the evidence.

The petition for rehearing will be denied.

*Rehearing denied.*

BARNES, P. J.; dissenting.
GRIDLEY, J., concurs.